[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 17, 2012
JOHN LEY
CLERK

Nos. 11-11659 & 11-11884
_____

D.C. Docket No. 8:08-cv-02458-VMC-AEP


LISA M. HOLLAND,

                                        Plaintiff - Appellant - Cross-Appellee,

                    versus

DAVID A. GEE,
in his official capacity as Sheriff
of Hillsborough County,

                                        Defendant - Appellee - Cross-Appellant.


_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(April 17, 2012)

Before MARTIN, HILL and EBEL,* Circuit Judges.

_____

      * Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by
designation.

MARTIN, Circuit Judge:

After hearing the evidence in this pregnancy discrimination case, the jury returned a verdict in favor of the plaintiff, Lisa Holland, and awarded her $80,000 in back pay and $10,000 for emotional distress. The defendant, Sheriff David Gee, moved for judgment as a matter of law. The District Court sustained the jury's finding of liability, but vacated the award of back pay. After careful review of the record and of the parties' briefs, and with the benefit of oral argument, we affirm in part, reverse in part, and remand for the entry of judgment on the jury's verdict.

## I. BACKGROUND

Ms. Holland joined the Hillsborough County Sheriff's Office in 2003 as a data processing telecommunications technician ("DP Tech"). Her responsibility as a DP Tech was to provide on-site computer and hardware support at various facilities operated by the Sheriff's Office. In November 2006, Ms. Holland informed the office that she was pregnant. Several months later, in March 2007, Ms. Holland was transferred to the Help Desk. Ms. Holland protested the decision, but to no avail. Eventually, however, Ms. Holland was transferred back to her DP Tech duties. In June 2007, she was terminated.

In November 2008, Ms. Holland filed suit against Hillsborough County

2

Sheriff David Gee, in his official capacity, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and under the Florida Civil Rights Act of 1992 (FCRA), Fla. Stat. §§ 760.01 et seq. Sheriff Gee filed an answer, denying liability. In that pleading, he did not assert the affirmative defense of after-acquired evidence.

The case proceeded to trial before a jury. At the close of Ms. Holland's case and again at the close of all of the evidence, Sheriff Gee moved for judgment as a matter of law. The District Court reserved ruling and submitted the case to the jury. Ultimately, the jury returned a verdict in favor of Ms. Holland. It found that Ms. Holland's transfer and her termination were both adverse employment actions and that Ms. Holland's pregnancy was a motivating factor for both decisions. The jury also awarded Ms. Holland $80,000 in back pay and $10,000 for emotional distress.

The District Court granted in part and denied in part Sheriff Gee's motion for judgment as a matter of law. The District Court held that there was enough evidence to support the jury's finding of discrimination. However, the District Court vacated the award of back pay on the ground that it was precluded under the doctrine of after-acquired evidence. Sheriff Gee renewed his motion for judgment

as a matter of law, arguing that the evidence was not sufficient to support the finding of liability. The District Court denied that motion, and the parties timely appealed.

## II. STANDARDS OF REVIEW

We review <u>de novo</u> a district court's ruling on a motion for judgment as a matter of law. <u>Montgomery v. Noga</u>, 168 F.3d 1282, 1289 (11th Cir. 1999). We also examine <u>de novo</u> whether a jury instruction misstated the law or was otherwise misleading. <u>Morgan v. Family Dollar Stores, Inc.</u>, 551 F.3d 1233, 1283 (11th Cir. 2008).

## III. DISCUSSION

### A. SUFFICIENCY OF THE EVIDENCE

#### 1. Legal Framework

Title VII prohibits employment discrimination on the basis of sex. <u>See</u> 42 U.S.C. § 2000e-2(a).[1] The Pregnancy Discrimination Act amended Title VII to provide that discrimination on the basis of sex includes discrimination "on the basis of pregnancy, childbirth or related medical conditions." <u>Id.</u> § 2000e(k). "The analysis for a pregnancy discrimination claim is the same type of analysis

---

[1] Although Ms. Holland asserted a claim under the FCRA as well, "decisions construing Title VII guide the analysis under [that statute]." <u>Harper v. Blockbuster Entm't Corp.</u>, 139 F.3d 1385, 1389 (11th Cir. 1998).

4

used in other Title VII sex discrimination suits." Armindo v. Padlocker, Inc., 209 F.3d 1319, 1320 (11th Cir. 2000).

Under Title VII, a plaintiff may prevail on a claim by showing that her pregnancy "was a motivating factor" for an employment decision. 42 U.S.C. § 2000e-2(m). To prove this, a plaintiff may offer either direct evidence or circumstantial evidence. Dixon v. Hallmark Cos., Inc., 627 F.3d 849, 854 (11th Cir. 2010). Direct evidence is "evidence that, if believed, proves the existence of a fact without inference or presumption." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (quotation marks omitted). "[O]nly the most blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." Id. (quotation marks omitted).

In cases involving circumstantial evidence, we apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). The Supreme Court developed this framework because it recognized that "direct evidence of an employer's motivation will often be unavailable or difficult to acquire." Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997) (quotation marks omitted). Thus, the burden-shifting scheme of McDonnell Douglas is a procedural device designed to help the parties progressively "sharpen

the inquiry into the elusive factual question" of the employer's motivations. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 n.8, 101 S. Ct. 1089, 1095 n.8 (1981).

Under McDonnell Douglas, the plaintiff must initially establish a prima facie case, which generally consists of the following: 1) the plaintiff was a member of a protected class, 2) she was qualified to do the job, 3) she was subjected to an adverse employment action, and 4) similarly situated employees outside of the protected class were treated differently. See Wilson, 376 F.3d at 1087, 1091. The prima facie case serves the basic function of "eliminat[ing] the most common nondiscriminatory reasons for the plaintiff's rejection"—namely, that the employee was not qualified for the position. Burdine, 450 U.S. at 253–54, 101 S. Ct. at 1094. "The burden of establishing a prima facie case . . . is not onerous." Id. at 253, 101 S. Ct. at 1094.

The prima facie case creates a presumption of discrimination, the role of which is to "forc[e] the defendant to come forward with some response." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510–11, 113 S. Ct. 2742, 2749 (1993). Thus, once a plaintiff makes a prima facie case, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." Wilson, 376 F.3d at 1087. "The employer need not persuade the [finder of fact]

that it was actually motivated by the proffered reasons." Id. (quotation marks omitted). However, "the defendant must clearly set forth . . . the reasons for the plaintiff's rejection." Burdine, 450 U.S. at 255, 101 S. Ct. at 1094.

Once the employer identifies a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination disappears, and the burden shifts back to the plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision." Id. at 256, 101 S. Ct. at 1095. The plaintiff "cannot recast the reason but must meet it head on and rebut it." Wilson, 376 F.3d at 1088. The plaintiff must show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's rationale. Combs, 106 F.3d at 1538 (quotation marks omitted). To do so, the plaintiff may rely on the evidence offered initially to establish the prima facie case. Wilson, 376 F.3d at 1088.

At this stage, the plaintiff's burden of rebutting the employer's proffered reasons "merges with the [plaintiff's] ultimate burden of persuading [the finder of fact] that she has been the victim of intentional discrimination." Burdine, 450 U.S. at 256, 101 S. Ct. at 1095. Thus, "the question becomes whether the evidence," when viewed as a whole, "yields the reasonable inference that the employer engaged in the alleged discrimination." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1326 (11th Cir. 2011). Put another way, the issue is

7

whether there is "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." Id. at 1328 (quotation marks and footnote omitted).[2]

We have recognized that "[a]fter a trial on the merits, [we] should not revisit whether the plaintiff established a prima facie case." Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1194 (11th Cir. 2004); accord Tidwell v. Carter Prods., 135 F.3d 1422, 1426 n.1 (11th Cir. 1998) ("Our task is not to revisit whether the plaintiff below successfully established a prima facie case of discrimination."); Richardson v. Leeds Police Dep't, 71 F.3d 801, 806 (11th Cir. 1995) ("[T]he district court erred by visiting whether [the plaintiff] had established a prima facie case . . . after the action was fully tried on the merits . . . ."); Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1129 (11th Cir. 1984) ("We are mindful . . . that when a disparate treatment case is fully tried . . . both the trial and the appellate courts should proceed directly to the ultimate question in the case.").

This rule reflects the fact that the basic function of the prima facie case is to "eliminate[] the most common nondiscriminatory reasons for the plaintiff's

---

[2] The "mosaic" may consist only of the plaintiff's prima facie case and of the evidence rebutting the employer's proffered reasons. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000).

rejection," Burdine, 450 U.S. at 253–54, 101 S. Ct. at 1094, and to "forc[e] the defendant to come forward with some response," Hicks, 509 U.S. at 510–11, 113 S. Ct. at 2749. It is a procedural device designed to help "sharpen the inquiry" into the employer's motivations. Burdine, 450 U.S. at 256 n.8, 101 S. Ct. at 1095 n.8. "[T]he employer is in the best position to put forth the actual reason for its decision." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S. Ct. 2097, 2109 (2000). Thus, once an employer proffers a reason for the action it took, "the factual inquiry proceeds to a new level of specificity." Burdine, 450 U.S. at 255, 101 S. Ct. at 1095.

The principle that the courts are not to revisit the existence of the prima facie case does not necessarily mean that the evidence introduced to support the prima facie case is irrelevant. First, "[w]here a component of the prima facie case is also an element of the claim," a court must look back to determine whether the evidence is sufficient to support that element, insofar as it is in dispute. Collado v. United Parcel Serv., 419 F.3d 1143, 1153 (11th Cir. 2005). In a Title VII case, an adverse employment action is not only an element of the prima facie case, Wilson, 376 F.3d at 1091, but also of the claim itself, see Davis v. Town of Lake Park, 245 F.3d 1232, 1246 (11th Cir. 2001). Thus, if that element is in dispute, a court must look back to see whether the element has been established.

9

Second, in order to discredit the employer's rationale, a plaintiff may use "the same evidence offered initially to establish the prima facie case." Wilson, 376 F.3d at 1088. Also, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148, 120 S. Ct. at 2109. Thus, to determine whether a jury's ultimate finding of discrimination may be sustained, a court may look back to the evidence related to the prima facie case. See id.; see also Combs, 106 F.3d at 1539 n.11. In sum, while we may look back to that body of evidence, "we do not revisit the existence of the prima facie case itself." Combs, 106 F.3d at 1539 n.11.

Here, Sheriff Gee urges us to overturn the jury's verdict on the ground that Ms. Holland did not establish a prima facie case. But this case has been fully tried on the merits, and the District Court refused to "dismiss the action for lack of a prima facie case." U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714, 103 S. Ct. 1478, 1481 (1983).[3] Thus, it is not now appropriate for us to look back to determine whether Ms. Holland in fact established one. See Cleveland, 369 F.3d at 1194; see also Richardson, 71 F.3d at 804–06.

---

[3] Sheriff Gee made a Rule 50(a) motion at the close of Ms. Holland's case and again at the close of all of the evidence. The District Court later denied that motion, insofar as it argued that Ms. Holland failed to establish a prima facie case.

10

Instead, we must "proceed directly to the ultimate question." Carmichael, 738 F.2d at 1129 (quotation marks omitted). Here, Ms. Holland's claim concerns two actions that the Sheriff's Office took: first, transferring her to the Help Desk, and second, terminating her. To determine whether the jury's verdict may be sustained, we must "review all of the evidence in the record." Reeves, 530 U.S. at 150, 120 S. Ct. at 2110. In doing so, we "must draw all reasonable inferences in favor of [Ms. Holland]." Id. We "may not make credibility determinations or weigh the evidence," id., and we "must disregard all evidence favorable to the [Sheriff] that the jury [was] not required to believe." Id. at 151, 120 S. Ct. at 2110.

### 2. Ms. Holland's Transfer to the Help Desk

Sheriff Gee argues that the jury could not have found that Ms. Holland's transfer to the Help Desk was an adverse employment action or that it was motivated by her pregnancy. We are not persuaded by these arguments.

### a. Adverse Employment Action

"[T]o prove [an] adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." Davis, 245 F.3d at 1239. "[T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. We have been careful to recognize that Title VII "does

11

not require proof of direct economic consequences in all cases." Id.; see also

Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64–65, 106 S. Ct. 2399, 2404

(1986). Thus, a transfer can be adverse "if it involves a reduction in pay, prestige

or responsibility." Hinson v. Clinch Cnty., Ga. Bd. of Educ., 231 F.3d 832, 829

(11th Cir. 2000) (emphasis added).

Here, there was evidence that Ms. Holland's transfer to the Help Desk was

intended to be permanent. Indeed, Teresa Sterns,[4] a supervisor who made the

decision to transfer Ms. Holland, said so in an email conveying the decision.

Beyond this, several witnesses at trial testified to the difference in the nature of the

work. Chief Deputy Docobo said that those at the Help Desk perform work that is

less technical and more administrative. Ms. Sterns explained that personnel at the

Help Desk answer and resolve issues over the phone, while DP Techs go on-site to

help end-users. Anthony Gay, a former co-worker, said that the staff at the Help

Desk provide "level one support" while DP Techs provide "level two support."

Both Ms. Sterns and Mr. Gay testified that some of the employees staffed at the

Help Desk had a lower pay grade than DP Techs. And Mr. Gay said that he would

---

[4] When Ms. Holland first joined the Sheriff's Office, her immediate supervisor was George Wihle. Mr. Wihle was later replaced by Vickie Lay. During the period of time that Ms. Lay was Ms. Holland's immediate supervisor, Ms. Lay reported to Ms. Sterns. Ms. Lay and Ms. Sterns were together the day-to-day supervisors of Ms. Holland. Ms. Sterns reported to Chris Peek, who in turn reported to Chief Deputy Jose Docobo.

12

have viewed Ms. Holland's transfer as a demotion.

When viewed in the light most favorable to Ms. Holland, this evidence supports the jury's finding that the transfer was an adverse employment action. Indeed, the jury could have found that the transfer was a permanent "reassignment with significantly different" duties, Davis, 245 F.3d at 1239 (quotation marks omitted), one that carried a reduction in both prestige and responsibility, Hinson, 231 F.3d at 829. Sheriff Gee draws our attention to evidence that the move was intended to be temporary. But this argument does not view the evidence in the light most favorable to Ms. Holland. Sheriff Gee also suggests that there was no adverse employment action because there was no reduction in pay. This argument, however, conflicts with the principle that Title VII "does not require proof of direct economic consequences in all cases." Davis, 245 F.3d at 1239; see also Meritor Sav. Bank, 477 U.S. at 64, 106 S. Ct. at 2404.

### b. Ms. Holland's Pregnancy as a Motivating Factor

The District Court concluded that there was direct evidence that Ms. Holland's pregnancy was a motivating factor for her transfer. Sheriff Gee argues that the District Court erred in so holding. This argument is unpersuasive. As the District Court noted, Ms. Sterns was asked at trial whether the transfer had "anything to do with Ms. Holland's pregnancy." Ms. Sterns testified that

13

I've thought about this quite a bit, and I'm sure that part of my decision was that as a mother, with knowing the history of her miscarriage, knowing how my pregnancy was rather difficult, I — I can only assume that part of that decision was that I felt it was — it was to be nice and to give Lisa a desk job. Concerned [sic] with her pregnancy was part of my reasoning. It was not the official reasoning, but it was certainly part of what I felt was — was right.

Ms. Sterns was also asked, "And you were the one who made the decision to transfer her?" Ms. Sterns testified, "Yes, I made the decision . . . . And I decided that [Ms. Holland] was the best candidate." Again, Ms. Sterns was asked "And part of that consideration in your mind was her pregnancy?" Ms. Sterns responded, "Yes."

Clearly, these are remarks that, "if believed," would prove that Ms. Holland's pregnancy was a motivating factor for the decision to transfer her to the Help Desk. Wilson, 376 F.3d at 1086. The fact that Ms. Sterns may have acted out of concern that Ms. Holland previously had a miscarriage—in other words, the fact that Ms. Sterns may have had benign intentions—is beside the point. After all, "[c]oncern for a woman's existing or potential offspring historically has been the excuse for denying women equal employment opportunities." Int'l Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 211, 111 S. Ct. 1196, 1210 (1991).[5]

---

[5] For this reason, insofar as Sheriff Gee insists that there must be proof of ill will or "animus," that suggestion is misguided. See Frontiero v. Richardson, 411 U.S. 677, 684, 93 S. Ct. 1764, 1769 (1973) (plurality opinion) (noting that discrimination on the basis of sex

Sheriff Gee resists this conclusion by drawing our attention to other portions of Ms. Sterns's trial testimony. First, Ms. Sterns was asked about an email in which she said that the transfer <u>was not</u> because of Ms. Holland's pregnancy. Ms. Sterns testified: "I said today that part of my consideration was the fact that she was pregnant. However, it was not the reason for the reassignment, and it certainly wasn't the reason for the need for the reassignment. . . . It was not a factor in the sense of the reasoning for the position." Second, Ms. Sterns testified that transferring Ms. Holland "was a matter of applying the resource where it was best needed." She said that she "needed additional resources to help with answering phones."

Sheriff Gee is correct that, if these other parts of Ms. Sterns's testimony were believed, they would undercut her prior statement that Ms. Holland's "pregnancy was part of my reasoning." However, it is not our role at this juncture to "make credibility determinations or [to] weigh the evidence." <u>Reeves</u>, 530 U.S. at 150, 120 S. Ct. at 2110. Bearing that in mind, we conclude that there was sufficient evidence for the jury to find that Ms. Holland's pregnancy was a

historically reflected "an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage"); <u>see also</u> <u>J.E.B. v. Alabama ex rel. T.B.</u>, 511 U.S. 127, 132, 114 S. Ct. 1419, 1423 (1994) (noting that discrimination on the basis of sex was historically "couched . . . in terms of the ostensible need to protect women").

motivating factor for her transfer to the Help Desk.

## 3. Ms. Holland's Termination

Sheriff Gee argues that there is not enough evidence to show that Ms. Holland's pregnancy was also a motivating factor for her termination. This argument fails as well.

### *a. The Proffered Reasons for the Termination*

Sheriff Gee first argues that Ms. Holland was terminated because of her "failure to complete various work orders and of her attitude based on her belief that no one could touch her because of her father." This reflects the thrust of Chief Deputy Docobo's testimony. At trial, Chief Deputy Docobo testified that it was his decision to terminate Ms. Holland and that the reason was that

> there had been, uh, a series of problems involving Ms. Holland going back quite some time. And, uh, it was clear to me that, uh, the manner in which she was conducting herself in her failure to do the job, uh, she was, uh, taking advantage of what I interpreted the relationship of her father, Mr. Richard Holland, with the Sheriff's Office, uh, almost with impunity and, uh, I was no longer going to deal with it.

When asked what the "series of problems" was, Chief Deputy Docobo stated that it went "back literally, uh, well over a year," that there were "problems with her work performance," and that Ms. Holland "was creating morale problems within the division." He also said that Ms. Holland "never obtained the requisite

16

certifications, uh, for the position, uh, of DP telecom tech."

Our review of the record persuades us that there was sufficient evidence for the jury to disbelieve this explanation. First, Chief Deputy Docobo conceded that he had no personal knowledge of Ms. Holland's work performance and that the information he had was from Mr. Peek. However, Mr. Peek testified that as far as he knew, the termination was not disciplinary. Similarly, Ms. Sterns said that the termination was "[ab]solutely not" disciplinary. Mr. Gay testified that to the best of his knowledge, Ms. Holland performed her job satisfactorily. And finally, Ms. Holland herself said that her supervisors "always said I did a great job, and thanked me." She told the jury, "I thought I was doing a good job. Actually they told me I was doing a good job." For this reason, she said, she was "devastated" when she was terminated.

The second proffered reason for Ms. Holland's termination—that she was "taking advantage of" her father's relationship with the Sheriff's Office—is "closely related" to the first. Woodard v. Fanboy, LLC, 298 F.3d 1261, 1267 (11th Cir. 2002). Indeed, according to Chief Deputy Docobo, Ms. Holland believed that she could get away with "her failure to do the job" because her father had ties to the Sheriff's Office. In view of the evidence that Ms. Holland's performance was not deficient, however, the jury could have found this additional

17

reason "fishy and suspicious as well." Id. (quotation marks omitted).

Third, with regard to the purported "morale problems," Chief Deputy Docobo was asked at trial to describe the nature of those issues. In response, however, he did not specify any negative effect that Ms. Holland might have had on other employees' productivity or engagement with work. Instead, he circled back to the purported problems with Ms. Holland's work performance. At trial, when asked whether Ms. Holland had a demoralizing effect, Mr. Gay stated, "No, absolutely not."

Fourth, with regard to the certifications, there is testimony suggesting that the Sheriff's Office requested that DP Techs obtain them. However, both Mr. Peek and Ms. Sterns testified that there were other DP Techs who were not required to do so. Mr. Peek said that "[t]here are techs that were hired prior to 2005 that do not have those certifications," and he agreed that "[t]he ones who don't have their certifications, they're capable of performing the job." Mr. Gay identified two DP Techs who did not have the certifications.

Fifth and finally, Sheriff Gee focuses on the fact that Ms. Holland began to decline work orders after she was transferred back from the Help Desk. This argument is also unavailing. The evidence showed that, after Ms. Holland was transferred back, she was directed to provide a doctor's note regarding restrictions

18

on her work because of her pregnancy.  The doctor advised Ms. Holland that she could continue to work, but that she should not be "in contact directly with any prison inmates."  Upon receiving the doctor's notes, however, the Sheriff's Office decided not to accept them; instead, it asked Ms. Holland to "write [her] own restrictions."

After some back and forth, Ms. Holland did so, and in an email, Ms. Sterns acknowledged receiving them.  She also indicated that she would get back to Ms. Holland on this issue.  However, the evidence showed that she never did so.  In the meantime, there was evidence that Ms. Holland was given work orders that would have involved contact with inmates.  Ms. Holland told the jury that she expressed her concerns to Ms. Lay.  Ms. Lay promised to get back to her, but she never did as well.  Thus, the evidence showed that the work orders that Ms. Holland could not complete were ones that she could not fulfill because of her pregnancy.[6]

Sheriff Gee argues that he did not honor Ms. Holland's restrictions because he believed that she was a contractor at the time.  Sheriff Gee acknowledges that

---

[6] We pause to note that the evidence, when viewed in the light most favorable to Ms. Holland, does not show that Ms. Holland sought "preferential treatment" on the basis of her pregnancy.  Spivey v. Beverly Enters., Inc., 196 F.3d 1309, 1312 (11th Cir. 1999).  Rather, the evidence supports the finding that the Sheriff's Office denied Ms. Holland "a benefit generally available to temporarily disabled workers" in the same position.  Id. at 1313; see also Byrd v. Lakeshore Hosp., 30 F.3d 1380, 1383–84 (11th Cir. 1994).  Indeed, there was evidence that the restrictions of DP Techs were routinely honored and that pregnant workers were accommodated in the same way as those who were temporarily disabled.

his belief was, in fact, mistaken. Indeed, in June 2007, the IRS issued a letter advising that under the Internal Revenue Code, Ms. Holland was an employee, and not a contractor. Sheriff Gee insists, however, that his belief was genuine and in good faith. This argument fails as well. Indeed, there was sufficient evidence by which the jury could have made a contrary finding, which would, in turn, have supported a finding of pretext. See Woodard, 298 F.3d at 1265–66.

The evidence showed that when Ms. Holland joined the Sheriff's Office, she was initially classified as a temporary employee. At the time, however, the Hillsborough County Civil Service Board prohibited the employment of temporary employees for more than 240 calendar days. To work around that rule, the Sheriff's Office had the practice of changing the job title of the temporary employee at the end of the 240-day period, which had the effect of restarting the 240-day clock. Eventually, the Sheriff's Office was advised that it could no longer engage in that practice. And in response, the Sheriff's Office reclassified Ms. Holland and the other temporary DP Techs as contractors.

The evidence, however, supported the finding that, despite making this change, the Sheriff's Office remained well aware that Ms. Holland was an employee, and not a contractor. Indeed, prior to making its decision, the Sheriff's Office sought the advice of counsel. Counsel informed the office that the DP

20

Techs were employees, and not contractors, because they had set work schedules, were subject to direct supervision, and were required to accomplish specific tasks. Counsel further advised that "the terms of the job would [need to] change" if the DP Techs, like Ms. Holland, were to be deemed contractors.

But the evidence showed that the Sheriff's Office did not adjust any of these aspects of the DP Techs' work relationship when it reclassified them as contractors. This contravened not only the advice of counsel, but also the recommendation of Ms. Sterns, who had written a memorandum on this subject, which was admitted into evidence. The evidence also showed that Mr. Wihle—who was initially Ms. Holland's immediate supervisor—also had concerns, and that he relayed his reservations to Ms. Holland and to management.

Eventually, Ms. Holland made an inquiry with the IRS. In June 2007, the IRS confirmed that under the Internal Revenue Code, Ms. Holland was, in fact, an employee, and not a contractor. As part of that process, the Sheriff's Office was asked to turn in a form describing the nature of Ms. Holland's work. On that form, which was signed by Chief Deputy Docobo, the Sheriff's Office stated that "Ms. Holland has no set schedule," that she "functions without any direct supervision," and "works on items she [chooses] to." The jury could have found that this contradicted what the Sheriff's Office knew.

21

Beyond all of this, the evidence showed that, even though Ms. Holland was repeatedly asked about her restrictions, and even though both Ms. Lay and Ms. Sterns indicated that they would get back to her on that issue, neither of them ever did. Thus, the evidence showed that Ms. Holland was <u>never</u> informed of the reason why her restrictions could not be honored, let alone told that it was because she was a contractor. Indeed, Sheriff Gee points to no evidence showing that such an explanation was ever given to Ms. Holland.

In light of this, the jury could easily have found that, contrary to Sheriff Gee's assertion, his belief that Ms. Holland was a contractor was neither genuine nor in good faith. The jury thus could have found that this explanation for the decision to deny Ms. Holland light duty was, in fact, cover for discrimination. <u>See</u> <u>Woodard</u>, 298 F.3d at 1265–66.

Apart from Ms. Holland's work performance, Sheriff Gee suggests that there was a second reason for the termination—that he no longer needed Ms. Holland's services after he had hired Richard Sanchez as a DP Tech. It is true that Mr. Peek's testimony supports this idea. However, this alternative rationale cannot be reconciled with Sheriff Gee's insistence that it was Chief Deputy Docobo's decision "alone" to terminate Ms. Holland and Chief Deputy Docobo's testimony that the termination was due to Ms. Holland's work performance.

22

Beyond this, as the District Court noted, Ms. Holland was kept for about four months after Mr. Sanchez started working.

Finally, Sheriff Gee argues that "there clearly appears on the face of this record another possible motivation"—the fact that Ms. Holland inquired with the IRS about her classification. Again, this suggestion cannot be reconciled with Sheriff Gee's assertion that it was Chief Deputy Docobo's decision "alone" to terminate Ms. Holland and his testimony that Ms. Holland was terminated because of her work performance. Indeed, Chief Deputy Docobo testified at trial that the Sheriff's Office did not "think anything ill of Ms. Holland for making [the] inquiry." A reasonable jury could have rejected the idea that Ms. Holland's inquiry led to her termination.

In sum, there was sufficient evidence for the jury to disbelieve all of the proffered rationales for Ms. Holland's termination.

### b. Other Evidence

We now examine whether there is "additional evidence" that, combined with the disbelief of the proffered reasons for Ms. Holland's termination, would have allowed the jury to find that Ms. Holland's pregnancy was a motivating factor for her termination. Cleveland, 369 F.3d at 1195. The issue is whether there is a "convincing mosaic of circumstantial evidence" that would support such

23

a finding.  Smith, 644 F.3d at 1328 (quotation marks omitted).  Our review of the record persuades us that there is such a body of evidence.

First, there was evidence that after she informed the Sheriff's Office of her pregnancy in November 2006, Ms. Holland was treated differently from all of the other DP Techs.  Cf. Cleveland, 369 F.3d at 1195 (noting that discrimination could be inferred from evidence that the plaintiff was treated differently "after she came back to work with her disability").  Indeed, there was evidence that unlike all of other DP Techs—all of whom were male—Ms. Holland was transferred to the Help Desk, and her restrictions not honored.

Second, there was evidence that after Ms. Holland disclosed her pregnancy, that fact became part of the decisionmaking processes regarding her.  As we have discussed, Ms. Sterns testified that Ms. Holland's pregnancy "was part of [her] reasoning" for transferring her to the Help Desk.  Similarly, Mr. Peek testified that "at various points" in that process, Ms. Lay and Ms. Sterns "raised" Ms. Holland's pregnancy as an issue.  Mr. Peek explained to the jury that Ms. Sterns "was a mother" and that Ms. Lay "was sensitive [to] those types of issues."

There was also evidence that Ms. Holland's pregnancy was a subject of the discussions that led to her termination.  Mr. Peek testified that the question of Ms. Holland's pregnancy came up when he talked to Ms. Sterns: they noted that Ms.

24

Holland "was far enough along in the pregnancy that the Sheriff's Office uniforms would not fit." Mr. Peek also testified that, when he talked to Chief Deputy Docobo, he informed his supervisor of Ms. Holland's pregnancy. All of this would have buttressed a finding of discrimination. Cf. Smith, 644 F.3d at 1346 ("[The] injection of race into [the] decision-making process yields an unavoidable inference that the employee's race impacted the [decision].").

Third and finally, we note that the credibility of Chief Deputy Docobo, the ultimate decisionmaker, was heavily challenged at trial, well apart from the fact that there was evidence to rebut his proffered reasons for terminating Ms. Holland. For instance, Chief Deputy Docobo denied that he "ever" knew that Ms. Holland was pregnant. Mr. Peek, however, testified to the contrary. Beyond this, Chief Deputy Docobo reviewed and signed the form in which the Sheriff's Office stated to the IRS that Ms. Holland "functions without any direct supervision" and has "no set schedule." The jury knew, however, that he was a recipient of Ms. Sterns's memorandum, which stated this was not the case.

All of this could have been the basis for the jury to make an adverse credibility determination as to Chief Deputy Docobo and thus further supported the finding of discrimination. See Cleveland, 369 F.3d at 1194 ("Once [the decisionmaker's] credibility was damaged, a rational jury could infer that he did

25

not fire [the plaintiff] because of the [proffered reason], but rather because of her disability."); see also Reeves, 530 U.S. at 147, 120 S. Ct. at 2108 (noting "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt" (quotation marks omitted)).

In sum, viewing the evidence in the light most favorable to Ms. Holland, we think the jury could have reasonably found that Ms. Holland's pregnancy was a motivating factor for her termination.[7]  It may also be true that a reasonable jury could have reached the opposite conclusion.  But the law is well settled that "if reasonable jurors could reach different results," judgment as a matter of law is improper.  Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 714 (11th Cir. 2002) (quotation marks omitted).

## B. BACK PAY

---

[7] Sheriff Gee's remaining arguments are not persuasive.  First, he argues that, as part of her prima facie case, Ms. Holland failed to show that she was qualified to be a DP Tech. However, there was evidence that DP Techs who did not have certain types of certifications were deemed "capable of performing the job."  Second, Sheriff Gee argues that Ms. Holland did not produce sufficient comparator evidence as part of her prima facie case.  But, at this juncture, this is beside the point.  Cleveland, 369 F.3d at 1194 (rejecting the argument that, after trial on the merits, the lack of comparator evidence, in and of itself, required judgment as a matter of law). The presence of a comparator "is not an element of a [Title VII] claim."  Collado, 419 F.3d at 1154; see also Smith, 644 F.3d at 1328.  The key question is whether, when viewed as a whole, "the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff."  Smith, 644 F.3d at 1326.

26

The jury found that Ms. Holland was entitled to recover $80,000 in back pay and $10,000 for emotional distress.[8]  The District Court vacated the award of back pay on the ground that it was precluded under the doctrine of after-acquired evidence.  On appeal, Ms. Holland argues that the District Court erred in doing so because after-acquired evidence is an affirmative defense, and Sheriff Gee waived it by not pleading it in his answer.  Ms. Holland also asserts that the District Court misapplied the doctrine because there was no evidence that she engaged in wrongdoing while she worked at the Sheriff's Office.

Sheriff Gee initially disputed these arguments.  In his brief, he asserted that the after-acquired evidence doctrine does not require employee wrongdoing; that he preserved the defense, even though he did not plead it in his answer; and that the District Court correctly applied the doctrine.  At oral argument, however, Sheriff Gee abandoned all of these arguments.  Sheriff Gee conceded that the doctrine applies only to cases involving employee wrongdoing and that there is no evidence that Ms. Holland engaged in any misconduct.  Sheriff Gee thus

---

[8] Back pay under Title VII is an equitable remedy, and as a result, it does not include a right to a jury determination.  Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1184 (11th Cir. 2010).  Under Federal Rule of Civil Procedure 39, however, a district court may, with the consent of the parties, have an issue be tried "by a jury whose verdict has the same effect as if a jury trial had been a matter of right."  Fed. R. Civ. P. 39(c)(2).  The record indicates that the parties gave consent.  See Whiting v. Jackson State Univ., 616 F.2d 116, 123 (5th Cir. 1980); Stockton v. Altman, 432 F.2d 946, 950 (5th Cir. 1970).  At trial, Ms. Holland asked the jury to award her $130,000 in back pay, but the jury found that she was entitled only to $80,000.

27

acknowledged that the District Court erred when it vacated the award of back pay on the ground that it was precluded under the after-acquired evidence doctrine.

We agree with both parties that the District Court erred, and we take this opportunity to explain why. The doctrine of after-acquired evidence finds its genesis in the Supreme Court's decision in McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 115 S. Ct. 879 (1995). There, after the employee was terminated, the employer came to discover that, during the employee's tenure, she had removed and copied company records in violation of her job responsibilities. Id. at 354–55, 115 S. Ct. at 882–83. With those facts in mind, the Supreme Court sought to delineate "[t]he proper boundaries of remedial relief in the general class of cases where, after termination, it is discovered that the employee has engaged in wrongdoing." Id. at 361, 115 S. Ct. at 886.

The Court held that if the employer "establish[es] that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge," an award of back pay should generally be limited to the period of time "from the date of the unlawful discharge to the date the new information was discovered." Id. at 362–63, 115 S. Ct. at 886–87. This rule, the Court explained, best took into account "the lawful prerogatives of the employer in the usual course of its

28

business and the corresponding equities that it has arising from the employee's wrongdoing." Id. at 361, 115 S. Ct. at 886.

McKennon arose under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. See McKennon, 513 U.S. at 354–55, 115 S. Ct. at 883. In our en banc decision in Wallace v. Dunn Construction Co., Inc., 62 F.3d 374 (11th Cir. 1995), we held that the after-acquired evidence doctrine also applies to cases arising under Title VII. Id. at 377. We further clarified that an "employee's misrepresentations in a job application" permits the application of the doctrine, just as "employee wrongdoing during employment" does. Id. at 379. In Wallace, the plaintiff denied in her job application that she had ever been convicted of a crime, even though she had a prior drug conviction. Id. at 377. We held that this misconduct supported the application of the after-acquired evidence doctrine. Id. at 379–80.

In vacating the award of back pay, the District Court cited our decision in Crapp v. City of Miami Beach, 242 F.3d 1017 (11th Cir. 2001). The District Court focused on our statement that "the City could have fired [the plaintiff] for a lawful reason—lack of certification—on the same day that it fired him for a discriminatory reason." Id. at 1021. The District Court read that sentence to mean that the after-acquired evidence doctrine applies so long as the employer

29

demonstrates that it could have terminated the employee for any lawful reason. We agree with both parties that the District Court misconstrued that sentence.

The plaintiff in Crapp was a police officer, id. at 1018, and following the events that gave rise to his Title VII suit, he was retroactively "decertified for conduct unbecoming [of] an officer"—namely, lying in the course of an internal affairs investigation. Id. at 1018–19 & n.5. Thus, what gave rise to the "lawful reason" for terminating the plaintiff in that case was the plaintiff's own misconduct. See id. Our decision in Crapp does not stand for the proposition that back pay may be denied simply because the employer could have terminated an employee for any lawful reason. Rather, consistent with the Supreme Court's decision in McKennon, it rests on the "equities that [the employer] has arising from the employee's wrongdoing." 513 U.S. at 361, 115 S. Ct. at 886.

Under the doctrine of after-acquired evidence, the burden is on the employer to prove that "the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone." Id. at 362–63, 115 S. Ct. at 886–87. Thus, it is an affirmative defense that an employer must plead in its answer or otherwise ensure that it is a subject of the pretrial order. See Pulliam v. Tallapoosa Cnty. Jail, 185 F.3d 1182, 1185 (11th Cir. 1999) (noting that the failure to plead an affirmative defense "is not fatal as long as it is included in the

30

pretrial order"). Here, in view of Sheriff Gee's concession that he did not plead or

argue this affirmative defense and that there is no evidence that Ms. Holland

engaged in wrongdoing, we conclude that the District Court erred in applying the

doctrine to vacate the award of back pay.

At oral argument, Sheriff Gee advanced the idea that the award is invalid

under the law of back pay itself—that is, the amount of back pay was not

calculated correctly. But, as Sheriff Gee acknowledged, that is a question that is

entirely distinct from the issue of after-acquired evidence, and it is governed by a

different line of case law.[9] The only argument that Sheriff Gee presented in his

---

[9] McKennon recognized two sets of equitable considerations: the employee's interests in invoking the national policy against employment discrimination and "the legitimate interests of the employer . . . [in] exercising significant other prerogatives and discretions in the course of the hiring, promoting, and discharging of [its] employees." 513 U.S. at 360–63, 115 S. Ct. at 885–87. It is the balancing of these equities that may limit recovery of back pay in a given case. See, e.g., id. at 361–62, 115 S. Ct. at 886–87. In a given case, the employer's interests may involve responding to an employee's misconduct, which the employer learned about after the discriminatory discharge, as in McKennon, Wallace, and Crapp. But in other cases, the employer's interest may involve, more broadly, the employer's ability to continue to make other lawful employment decisions that still might adversely affect the wrongfully discharged employee's continued employment status, independent of any discrimination.

The after-acquired evidence doctrine addresses those situations where the employer, after its discriminatory discharge of an employee, learns of that employee's misconduct sufficient to justify the employer's decision, after the fact, to discharge the employee for lawful, nondiscriminatory reasons. The Eleventh Circuit, however, has not applied the after-acquired evidence doctrine to circumstances where, after a discriminatory discharge, the employer learns of information, unrelated to the employee's misconduct, which also disqualifies that employee from continued employment. Instead, in those circumstances, the Eleventh Circuit has applied other equitable defenses to an award of back pay (and front pay), defenses that protect the employer's continuing interest in being able to make nondiscriminatory policy, organizational, or personnel decisions.

Under our precedent, an employee seeking to recover back pay bears the initial burden of

31

brief is the assertion that the District Court correctly applied the doctrine of after-acquired evidence. He did not discuss, let alone cite, any cases concerning the proper calculation of back pay. See generally Fed. R. App. P. 28(a)(9)(A), (b) (requiring an appellee to develop an argument "with citations to the authorities . . . on which [he] relies").

Under these circumstances, we cannot accept Sheriff Gee's last-minute attempt to raise this alternative argument. "[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004). Although we may affirm a district court's decision on grounds not reached by that court, Chappell v. Chao, 388 F.3d 1373, 1376–77 (11th Cir. 2004), we do not consider arguments "not raised in a party's initial brief and made for the first time at oral argument," APA Excelsior III L.P. v. Premiere Techs., Inc., 476 F.3d 1261, 1269 (11th Cir. 2007).

---

demonstrating wages lost as a result of the employment decision. Walker v. Ford Motor Co., 684 F.2d 1355, 1361 (11th Cir. 1982). In a case where the plaintiff employee's position is eliminated immediately after her termination, back pay might be reduced if the employer can "establish by a preponderance of the evidence that [the] plaintiff would not have been retained in some other capacity." Archambault v. United Computing Sys., Inc., 786 F.2d 1507, 1515 (11th Cir. 1986). To preclude back pay under this line of authority, the employer need not prove employee misconduct, but instead must show that the employee would not have been transferred to another position or otherwise be retained. See id. at 1515–16; cf. Munoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1350–51 (11th Cir. 2000) (holding that, to preclude front pay, an employer must show that the employee would not have been retained in any capacity at the time of trial).

32

Here, given that Sheriff Gee has waived this alternative argument by not discussing it in his brief, see La Grasta v. First Union Sec., Inc., 358 F.3d 840, 847 n.4 (11th Cir. 2004), we do not find it appropriate to address it on its merits. See Access Now, 385 F.3d at 1330.[10]

## C. SUPPLEMENTAL JURY INSTRUCTION

Sheriff Gee's final argument is that the District Court erred in its response to a question from the jury. While it was deliberating, the jury sent a note to the District Court asking, "Was Ms. Holland at the time of her termination an employee of the Hillsborough County Sheriff's Office?" After conferring with the parties, the District Court told the jury:

> The Court has found as a matter of law that for the purposes of the laws at issue in this case, Title VII of the Civil Rights Act of 1964, and the Florida Civil Rights Act, Ms. Holland was an employee of the Sheriff's Office and not an independent contractor.

We examine jury instructions de novo to determine whether they misstate the law or mislead the jury to the prejudice of the party who objects to them.

---

[10] Even if we were to do so, we are doubtful that Sheriff Gee's argument would prevail. According to Sheriff Gee, "[t]he undisputed evidence clearly shows that [he] had no ability to employ [Ms.] Holland as a DP Tech following [the] IRS's determination." However, to foreclose back pay, Sheriff Gee had to prove that Ms. Holland "would not have been retained in some other capacity." Archambault, 786 F.2d at 1515 (emphasis added). While the evidence may very well demonstrate that Ms. Holland could not have been retained as a full-time DP Tech, Sheriff Gee did not, either in his brief or at oral argument, cite to any portion of the record that would suggest that Ms. Holland would not be retained in some other position at the Sheriff's Office. Thus, even if we were to consider this alternative argument, we would have to reject it.

33

Morgan, 551 F.3d at 1283. We have stressed, however, that "the standard is deferential." Id. (quotation marks omitted). "Our practice is not to nitpick the instructions for minor defects." Id. "When the instructions, taken together, properly express the law applicable to the case, there is no error even though an isolated clause may be inaccurate, ambiguous, incomplete or otherwise subject to criticism." Id. (quotation marks omitted).

Here, prior to trial, the District Court found as a matter of law that Ms. Holland was an employee under Title VII and the FCRA. Sheriff Gee has not contested that determination, and the supplemental instruction conveyed only that finding. Under these circumstances, we are hard-pressed to see how the instruction could have been improper. Sheriff Gee suggests that the instruction "gave the jury the impression that [he] could not have actually believed that [Ms.] Holland was an independent contractor at the time of her termination." However, the instruction states only that the District Court made its determination after the fact and under Title VII and the FCRA. It obviously left it to the jury to determine whether, at the time of Ms. Holland's termination, the Sheriff could have genuinely believed that she was otherwise a contractor.

## IV. CONCLUSION

For these reasons, we affirm the District Court's decision to sustain the

34

jury's finding of liability, we reverse its decision to vacate the award of back pay, and we remand for the entry of judgment on the jury's verdict.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**